United States v. Zamora at his DACA 22-4096 Council. May it please the Court, Bretta Peary on behalf of Kevin Zamora. Near the end of the first sentencing hearing, the district judge indicated that she was going to require evidence before she could rule on either Mr. Zamora's request for a non-custodial sentence or on the government's effort to bear its burden to show that a reckless endangerment enhancement applied. The prosecutor argued this really wasn't necessary because she'd already proffered that she'd spoken to a number of law enforcement agents who had said, Glocks do not discharge unless there's a pull on the trigger. When the district court indicated that she would still actually like evidence to prove this point, the prosecutor resisted again, saying, I just don't even see that testimony is necessary. I mean, it's just known that if a Glock is fully loaded and the slide is cocked, it doesn't go off by itself. So the arguments and the evidence that followed must be seen in the way the government chose to phrase its effort to carry its burden, that it's just known by everybody that Glocks don't accidentally fire. Well, isn't it also just known that you don't carry a gun in your pants, your underwear and run around,  but I think the evidence in this case suggests that. I mean, I don't think the government would necessarily agree with this, that that summary of the evidence, at least not below. It was the government's position that it was perfectly safe to run around with a gun loose in your pants. I'd like to begin by to go back for a moment and say also, we don't know where the gun started out. It may have started out in his waistband and falling into his pants as he ran. It was unholstered. It was unholstered. But it was the government's position that Glocks are so safe that if you don't put a finger on the trigger, that gun isn't going to go off. The government's experts said if you drop a Glock, it's not going to go off. He cited the Glock manufacturer's website saying that Glocks don't go off without a deliberate pull on the trigger. Counsel, can you help me with a fact I'm having trouble with, and that is the presence of the car, occupied vehicle and the driver? And is there a particular whether that increased it? Well, my question is, how do you get around clear error with that fact in your way? Well, that fact was not presented to the district court. So there's no finding on that fact. The government didn't urge that below as a basis for finding that there was danger. So we're to ignore it? I think that that fact, yes, it wasn't presented to the district court. It's offered anew to this court. I want to make sure I understand your position as a legal matter. If we're on clear error review and there is a fact in the record, an undisputed fact in the record that is visible, as it is here in the video, and the district court did not rely on that fact, is it your position that we cannot consider it because it was not pressed as part of the government's theory of the case? I think the car is in the video. This court can look at the car in the video. I'm sorry. Sorry? I didn't understand what you just said. Yes. This court can look at the video and see that there was a car in the drive-through. But I want to make a couple points about that. The point, the argument the government urged below about cars was that there was a danger because of traffic that an officer was going to get hit by a car, that one car was going to hit another. That danger was clearly not present here. It can be seen in the video that the car is crawling along. It appears, and the video is not very clear, it appears from my viewing of the video that it stops immediately as Mr. Zamora falls to the ground. So the officers weren't in danger from that car. The other point I'd like to make. Are we only worried about the safety of the officers, not the occupants? The point I'd like to make about that is that the only evidence in this record as to who was endangered by the manner in which Mr. Zamora was carrying the gun is that offered by Mr. Boddy, Mr. Zamora's expert. The district court asked Mr. Boddy explicitly, does carrying a gun in this way create a danger for bystanders? And he said, possibly, more likely, it's a danger to the person carrying it that way. The government would have to prove by a preponderance standard that carrying the gun in that way endangered the people in the car. But the only evidence is that it's logically impossible for the government to get to a preponderance standard. Well, the only evidence is the gun went off. And if it hadn't gone through the guy's leg, it might have gone right through the car or it might have gone through somebody else. But that's not what the evidence in this case is. The evidence in this case is the only evidence there is is that that was most likely a danger to the person carrying the weapon. And it makes sense in terms of the mechanism by which a gun, a Glock, can accidentally misfire, which is that it's being pushed down on, that something like clothing gets in the trigger mechanism and then force is exerted down. So that means the gun is going to fire down. The risk that materialized in this case is exactly the one that the only testimony talks about. That's giving yourself the benefit of all of the inferences, though, which is to say, as Judge Kelly points out, as I understand it, there's a dispute, was it in his pocket, was it in his waistband? But it appears it was in his waistband. And so he's running. And if you've got a gun in your waistband and your pants are not tight, which the video, maybe you'll dispute that, but it looks as though there's some looseness, and what's going to happen? The gun is going to jostle. And the person's not wanting the gun to fall on the street because they want the gun. And so you're going to reach and grab the gun and reposition it or something. And once you have your hands on that gun, there's a substantial risk of someone getting hurt. The officers may see your hand on that gun, at which point the risk of a gunfight is substantial. Or he was reaching for the gun to pull it out, to use it. But the district court didn't make that finding. But we have facts. We have a video. Oh, please. We don't have a district court finding. And in the video, there's nothing to suggest he reached for it. Why do you need a specific finding that this gun was pulled or it went off? The thing went off, and it went right through his leg. And he didn't do that on purpose, maybe. But that points out the danger of running with a loaded gun in your pants. But the danger, according to the – again, the only evidence is the danger was to him, and the guideline excludes that danger. No, the danger was not just to him, because the bullet didn't stop. It doesn't have to stop. It can keep going. It can go for many feet, many yards. And a judge can make that decision based on what he sees, how he develops the whole situation. I don't think you have to prove beyond a reasonable doubt each and every item in order to come up with an enhancement based on the conduct of the individual. No, but the government has the burden to prove it by a preponderance. And again, the government's expert would have said there was no danger at all just in carrying the gun. Well, maybe the gun didn't really go off, and it's just somebody's imagination that the bullet went through his leg. The government, under their theory, he had to have pulled the trigger. The district court wouldn't have. But the district court rejected that argument. I mean, rejected that evidence, right? The district court rejected the evidence. So as you said in your opening, the entire presentation of the evidence is steered by the government's theory of the case that he must have had his finger on the trigger, otherwise Glocks are super safe, right? Yes. Okay, so the district court rejects that and says we don't know exactly what happened, right? Correct. So in order for you to prevail here, do you agree that what we see in this record has to be something more than mere armed flight? You need a plus factor of some kind, right? Yes. What is that? How is that not present on this record? And I want you to speak to my question and include the car in the drive-through. That isn't present on this record because Mr. Zamora didn't undertake a known risk beyond mere flight with the gun. The point of our argument is that Glocks are exceptionally safe guns, apparently. Mr. Zamora didn't dispute that. But they do have a risk of accidental firing. Mr. Zamora did not, it was not generally known that that risk existed from doing this this way. So is this insufficiency of the government's presentation focused on the standard of care? Is that what you're saying? Is that there was an insufficient evidence? Yes, there was not a known, there was not a known, generally known risk that carrying the gun in the pants this way presented a risk to others. And again, the only evidence in the record is that this was a risk to him not to bystanders. So I really don't think that the presence of the car in the Taco Bell adds anything. If it was risky to carry the gun this way, then it was risky because the officers were in pursuit of him. What I'm not agreeing with, and so I need some help from you, is you seem to be looking at what happened here and nobody was hurt and the only one who did be was him. Because look what happened, he got shot in the leg. But what the guideline asks is, is there a substantial risk of death or serious bodily injury in the course of laying the law enforcement officer? It doesn't have to be fired even. A firearm could have stayed in his waistband or in his pocket. But when someone runs with a bullet in the chamber, someone runs with a firearm that is not secured, it's not in a holster, it's either loose in the waistband or it's loose in the pocket, because remember, he's not strolling down the street, he's running. And it is entirely foreseeable and strong likelihood that the gun is going to jostle in someone's jeans when they're running in that fashion and that the person is going to have to account for that by taking control of the gun and either repositioning it where it was or taking it out so it doesn't fall. And once you get to that point, if you just freeze frame right there and we never know if the gun went off or anything else, why don't you have a substantial risk right there? Because the district court refused to find that he reached for the gun. The government didn't prove by a preponderance. I don't care. I don't care if the district court found that finding or made that finding or not. If the district court found that he had a firearm, it was either in his pocket or in his waistband, and he was running. Because the rest of it doesn't have to happen. There's a substantial risk. It doesn't have to happen that he grabbed the gun. There's a substantial risk that when you run with a firearm in that position, you're going to have to readjust and get the firearm so it doesn't fall off of you, in other words. Even if it didn't, it doesn't matter if it did or not. The point is there's a substantial risk that it might happen. And if there's a risk that it might happen and he touched that gun, then game over, it seems like. There's no finding that he touched the gun. There's no finding. I mean, I think that's a different case than we have here, and there is. But please, I want you to address my point. I have already conceded to you that there's not a finding that he touched the gun. But there is a finding that he had the firearm on his body in his waistband or perhaps in his pocket seems less likely, and that he was running. And from that, there's a risk, well, you concede this point, that someone with a gun in their waistband or pocket who is running from the police, which is to say running, that that firearm might come loose and have to be grabbed, even if it wasn't here. I don't know the answer to that question, Your Honor. I think it depends on the tightness of the pants. I think it depends on how they're running. And I would return again to the point that I don't think this is a risk that's generally known. My question is sort of following on what Judge Phillips is asking you. The evidence that you presented with your expert was to rebut the government's theory of the case that he had a finger on the trigger, correct? Sorry, to rebut the government's. To rebut the government's expert. The government said, yeah, right. So your expert's testimony found that the Glock could have accidentally discharged. Yes. How does that help you here? It helps us because we didn't dispute the fact that this risk, that Glocks are known to be exceptionally safe guns. This wasn't a risk that was generally known. And it also helps us because our expert went on to testify that the risk was to him, not to anybody else. That's the only evidence in the record as to what the risk was. And you can't argue backwards from a risk materializing to whether the conduct was reckless in the first place. It's not that straightforward. Otherwise, whenever anything bad happens in life, we'd say, well, that was clearly reckless because something bad happened. And this court has also found in the reverse situation repeatedly that just because a risk doesn't materialize doesn't mean that the conduct wasn't not reckless to begin with. You can't just go backwards and say, well, the gun went off, so it was clearly reckless. It's a question of fact. And the facts in this case were that the risk was to him, and that was unrebutted. There was no testimony going the other way. There's nothing in this record that permits a factual finding that other people, other than Mr. Zamora, were put at risk by this conduct. If there are no further questions, I will reserve my time. Thank you, Counsel. Good morning, Your Honors. Brigham Matheson on behalf of the United States. The district court did not clearly err in finding that Mr. Zamora recklessly created a substantial risk of serious bodily injury to others when he ran to the police with a loaded Glock, loose in his pants, with a round chambered and ready to fire, which ultimately was fired just feet away from an occupied vehicle. This was not mere armed flight. This was armed flight plus more. And the district court did not err in finding that that determination did not turn on a zero-sum analysis of the specific firing mechanism that caused the gun to discharge. Judge Phillips, to answer your question about the risk that was created by carrying the gun the way Mr. Zamora was carrying it, that's precisely what the district court honed in on at the sentencing hearings that the evidence showed. Counsel, the district court rejected your theory, right? Well, the district court declined to make a finding about what the specific firing mechanism was that caused the gun to discharge. Correct. We don't know what happened. It was the finding, basically. That was what the district court said, is that either way, the essence of the recklessness that Mr. Zamora engaged in was in carrying the gun the way that he was carrying it in the condition that it was in, which created, as the district court pointed out, a substantial risk that the gun could go off in multiple ways, whether that was from Mr. Zamora reaching for it as he ran, whether that was from some item overcoming the trigger as he ran, or if that was a result of the officers in patting Mr. Zamora down after they'd subdued him. There were multiple ways this gun could go off, and that had to do with the condition of the gun and how Mr. Zamora was carrying it. And actually, I think Mr. Zamora, in his opening brief, makes the point quite clearly that the specific facts surrounding the particular manner in which you carry a particular type of gun, that makes a difference for the recklessness analysis, and that's precisely what the district court found. What do you say to your friend's argument that this was not a risk that was generally known based on the evidence presented? I think the district court, based on the evidence presented, concluded that this was a risk that deviated substantially from the standard of care that a reason— The word standard of care don't appear in her ruling. Part and parcel of— Is that right? Do you agree with that? The standard of care does not appear in the ruling? I disagree with that, Your Honor, in the sense that the essence of recklessness for the enhancement to apply is whether the defendant's conduct constituted a gross deviation from the standard of care that a reasonable person would have exercised— So it was implied. But she didn't make a separate finding that this was, in fact, a gross deviation from the standard of care. Do you agree with that? I don't know that I do respect, Your Honor. I do think that the district court found that Mr. Zamora's conduct in carrying the gun the way that he carried it was a deviation from what a reasonable person would do under the circumstances. Okay, so let's just assume that we agree that there is a finding on standard of care because the enhancement was applied, right? So what is the evidence in this record that supports a gross deviation from the standard of care? The evidence includes the testimony of Mr. Zamora's own Glock expert, Mr. Body Testified. He said it was simple physics, that if you're carrying a gun the way Mr. Zamora was carrying it, in your pants, and that gun is not just loaded but has a live round chambered and ready to fire, if that gun is subjected to physical activity that could force the trigger down against an object, the gun can go on. And the district court didn't err in crediting that testimony. I'd also note that the government's Glock expert, Agent Owens, on cross-examination for Mr. Zamora's counsel, agreed that if you have a Glock being carried this way with an exposed trigger assembly and an object gets in between the trigger guard and the trigger and force is exerted against that gun, however it's being moved, the gun can go off. And so the district court found that based on that evidence, it didn't matter whether Mr. Zamora ultimately caused the gun to discharge because his finger touched the trigger or something else caused it to go off. The deviation from the standard of care that a reasonable person would have exercised was in carrying the gun the way that he was carrying it in the condition that it was in. Reasonable people don't run from the police carrying Glocks this way. At what point did the guideline kick in? To Your Honor's point about the gun going off, I think that the fact that the gun discharged in this case is a relevant fact. It's one of the plus factors that takes this outside of the category of mere possession of a firearm during flight and armed flight plus more. But it's not an essential fact. Isn't it just significant because we know there was a bullet in the chamber? The fact that it went off doesn't matter. Well, we know that there was a bullet in the chamber, but we also know that five to seven pounds of pressure was exerted on that trigger as Mr. Zamora crossed over the drive-through. That trigger was pushed back a quarter of an inch to a half of an inch, whether by his finger or by some other item in his pants as he ran. But as you alluded to, Judge Phillips, the recklessness, the deviation from the standard of care that a reasonable person would have exercised was in carrying the gun the way that Mr. Zamora was carrying it in that condition with a live round loaded and ready to fire so that all that had to happen for that gun to go off was for the trigger to be pushed back. So had he stopped at the drive-up and put his hands in the air and surrendered, would the reckless endangerment apply or not? It would still apply, Your Honor. All of the district court's findings as far as what amounted to the deviation from acceptable standards of care would still be true, and it would still be based on the evidence presented at the second sentencing hearing, including Mr. Boddy's testimony about the risks of carrying a Glock with a live round in the chamber and with an exposed trigger assembly. Well, what do you say to the appellant's argument that the risk evidence in this case is only about a risk to Mr. Zamora? I disagree that the only evidence in the record was that it was a risk to Mr. Zamora. I think Mr. Boddy testified that there was possibly a risk to others, that maybe it was more of a risk to Mr. Zamora because the gun was on his person. But I think that it was a reasonable conclusion for the district court to draw based on the fact that the gun discharged, based on the body-worn camera footage, that it's common sense that if you have a gun going off loose in your pants as you run, this is hardly a controlled-aim discharge, and it's only by dint of luck that the only person that was hit by this bullet was Mr. Zamora when he was just feet away from an occupied vehicle as he crossed over that drive-through. How would you have us think about the car in the drive-through? The district court didn't factor that in. There's no finding. Again, Your Honor, it's one of the plus factors that puts this case firmly in the category of reckless endangerment. So would we be considering it as part of our clear-error rubric? You asked for alternative affirmance on that fact, but that didn't really make sense to me, so maybe you can help me understand how to situate it into the analysis. Certainly, Your Honor. The district court identified the risk of the substantial injury to others in the context of the pursuing officers. That's in the district court's announcement of its decision to apply an enhancement. That's page 122 of Volume 2 of the record. The government included the fact about the occupied vehicle in the drive-through to simply point out that in addition to the pursuing officer, there were others put at risk by the discharge. Again, they were just feet away from Mr. Zamora when that bullet went off. And so this court, given its broad authority to affirm on any basis supported in the record, can also affirm on the grounds that Mr. Zamora recklessly created a substantial risk of death or serious bodily injury to those individuals as well as the pursuing officers. I would just emphasize, Your Honor, the clear-error standard does, I think, play an important role in this appeal. As Your Honors alluded to earlier, the facts of this case have to be viewed in the light most favorable to the district court's determination. And the district court was in the best position to evaluate the evidence, to consider the risk, and it exercised its function diligently. It held two sentencing hearings. It received testimony from two Glock experts. It reviewed the body-worn camera footage. It examined the Glock training firearm to understand the nature of the risk and in determining that the enhancement applied, did not commit clear error. Unless this court has any further questions, we respectfully request that the court affirm the application of the enhancement. Thank you, counsel. Thank you. Two very quick responses. A risk has to be substantial to count under the guidelines. And the fact that a risk is possible, which is what Mr. Boddy testified to, doesn't make it rise to the level of being a substantial risk. And once again, the only evidence in the record is that this was a risk to Mr. Zamora and nobody else. And to look at the fact that the gun discharged as an element of defining whether it was reckless, but not to look at the manner in which it discharged doesn't make sense. Thank you. Thank you, counsel. The case is submitted. Counsel is excused.